UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------x
NICHOLAS AIOLA,

            Plaintiff,

    -against-

MALVERNE UNION FREE SCHOOL DISTRICT,
MALVERNE UNION FREE SCHOOL DISTRICT BOARD
OF EDUCATION, SPIRO COLAITIS, JAMES BOSWORTH,
and JAMES HUNDERFUND,

            Defendants.
--------------------------------------------------------------------------------x

**Memorandum of
Decision & Order
15-cv-64(ADS)(AYS)**

<u>APPEARANCES:</u>

**Jonathan A. Tand & Associates**
*Attorneys for the Plaintiff*
990 Stewart Avenue, Suite 130
Garden City, NY 11530
        By:    Jonathan A. Tand, Esq.
                Hope Senzer Gabor, Esq., Of Counsel

**Sokoloff Stern LLP**
*Attorneys for the Defendants*
179 Westbury Avenue
Carle Place, NY 11514
        By:    Brian S. Sokoloff, Esq.
                Melissa L. Holtzer, Esq., Of Counsel

**SPATT, District Judge:**

Presently before the Court in this employment discrimination case is a motion by the
Defendants, pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P.") 56, seeking summary
judgment dismissing the complaint. For the reasons that follow, that motion is granted in part and
denied in part.

## I.    BACKGROUND

Unless otherwise noted, the following facts are not in dispute.

In the Spring of 2007, the Plaintiff was hired as the Head Custodian for Malverne High
School. In this capacity, his principal duty was to ensure the cleanliness and safe operation of the

high school building. In furtherance of that objective, the relevant civil service job description identifies the Plaintiff's job responsibilities as including the assignment of tasks to subordinates and supervision of their performance; supervising building operations during school events; supervising the operation of a low pressure boiler, hot air furnace, or hot water boiler heating system; making periodic inspections of maintenance activities; maintaining records of time and material usage and preparing progress reports of ongoing activities; requisitioning, receiving, and distributing building cleaning supplies; supervising the operation and maintenance of an air conditioning system; and assisting with maintenance and custodial tasks, as required.

Consistent with these responsibilities, the Plaintiff testified at his deposition that he regularly distributed assignments to the five custodians who worked under him and ensured the completion of those assignments.

In addition to his duties as the Head Custodian, the Plaintiff held the position of District Checker, which, for an annual stipend, required him to patrol the high school grounds during after-school events and respond to alarms at the school building after hours.

Beginning in July 2007, the Plaintiff's supervisor was the Defendant Spiro Colaitis, who started as the Executive Director of Facilities before being promoted to Assistant Superintendent of Operations for the Malverne Union Free School District. At all relevant times, the Plaintiff reported to Colaitis and High School Principal Vincent Romano.

Over the Labor Day weekend in 2008, one of the Plaintiff's subordinates, Michael Murphy, reported an after-hours leak at the high school. As the schoolyear was scheduled to start in a matter of days, after responding to the school grounds and assessing the situation, the Plaintiff called every available custodial worker to help repair the leak and clean up the damage. Approximately 12 to 15 workers responded to the Plaintiff's call for help.

When Colaitis arrived on the scene, he was angered to see that the Plaintiff had enlisted the help of so many employees, all of whom would assumedly be entitled to overtime pay for their time. He assessed the leak to be minor and questioned the Plaintiff's judgment in handling the situation.

According to the Plaintiff, this event was the turning point in their relationship, after which the Plaintiff perceived Colaitis to take a hostile posture toward him. Colaitis agreed that this event "set the tone" for their working relationship. The Plaintiff contends that, following his handling of the leak in 2008, he experienced difficulty obtaining necessary school supplies from Colaitis and he received "cold stares" and other aggressive mannerisms from Colaitis that made him feel uncomfortable.

However, it is undisputed that, at the time of this event, the Plaintiff was not disabled and attributed Colaitis' treatment of him to his belief that Colaitis wanted another custodian named Robert Hodge – who assertedly was Colaitis' personal friend – to have the position of Head Custodian.

The record contains a documented history of performance issues on the part of the Plaintiff. For example, on or about March 19, 2010, Colaitis prepared a memo to the Plaintiff, entitled "Insubordination and Poor Performance." This memo outlined various performance issues, including a failure to maintain the cleanliness of the school kitchen; failure to discipline subordinates who disregarded the Plaintiff's orders (a circumstance he testified happened daily); and failure to properly train staff in the use of building equipment. The memo also noted that the Plaintiff questioned and/or argued over directives given by Colaitis; refused to sit down during a meeting with Colaitis; and "went on a tirade dictating who [he] report[s] to and what [he] is capable of doing."

The Plaintiff disputes the accuracy of the events set forth in this memo.

In January 2011, the Plaintiff suffered an on-the-job injury to his right shoulder shoveling snow, which caused him to take a medical leave. It is undisputed that he did not perform his duties

as District Checker during his medical leave. Thus, although he continued receiving his annual stipend through May 30, 2011 – approximately four months after his injury – those responsibilities were eventually reassigned.

In a letter dated June 7, 2011, Colaitis informed the Plaintiff that, due to his "inability to perform" the duties of District Checker, the associated stipend had been removed from his pay effective May 30, 2011. A related document entitled "Report of Personnel Action" indicates that the Plaintiff's removal from the District Checker position was not a disciplinary action and that those responsibilities had been reassigned to the District's security staff.

The Plaintiff's deposition testimony indicates that, prior to this litigation, he did not attribute the loss of his District Checker responsibilities to his injury. Rather, he apparently believed, mistakenly, that the position had been given to Robert Hodge as part of Colaitis' broader plan to install Hodge as Head Custodian. He conceded that he has no information or evidence to refute the fact that the District Checker position was simply included in the normal responsibilities of the school's security staff.

In any event, the Plaintiff returned to work in the summer of 2011. A July 20, 2011 doctor's note by Mark G. Grossman, M.D., of Winthrop Orthopaedic Associates in Garden City, indicates that the Plaintiff was cleared to return to full duty and did not identify any restrictions.

According to the Plaintiff, despite his clearance to return to full duty, he still experienced some pain and limitations upon his return to work. Nevertheless, he testified at his deposition that he delegated to his subordinates any manual tasks that he felt unable to perform himself. In addition, the Plaintiff acknowledged that, to the extent his recovering shoulder left the custodial crew shorthanded, he was authorized to reassign members of the evening cleaning crew to help on the day shift.

In fact, at his deposition, the only change that the Plaintiff identified in his post-injury working conditions was his perception that Colaitis did not take him seriously or respect his managerial position.

Further, consistent with their prior relationship, the Plaintiff claims that Colaitis remained dissatisfied with his job performance after he returned from leave. In this regard, the Plaintiff again believes that Colaitis mistreated him because he would have preferred Robert Hodge to be the Head Custodian and the Plaintiff was "in the way." However, the Plaintiff conceded not knowing why Colaitis was actually dissatisfied with his work, and did not attempt to learn the real reason.

On May 21, 2013, the Plaintiff was apparently examined by orthopedist Howard Levin, M.D., who concluded that the Plaintiff was restricted in his ability to work above shoulder level with his right, dominant arm. However, the Plaintiff testified at his deposition that he never provided to the District this medical report, or any other doctor's note reflecting a limitation in his ability to perform the essential functions of his job.

In November 2013, the Plaintiff suffered a second on-the-job injury to his left shoulder while sanding the gym floor, which again caused him to take a medical leave.

Although the Plaintiff claims to have missed four to five months of work due to this injury, the record contains a doctor's note from Eric L. Freeman, M.D. of South Island Orthopaedic Group, P.C. in Cedarhurst, which is dated December 18, 2013, and which clears the Plaintiff to return to "full activities" at work, without identifying any physical limitations, as early as December 26, 2013.

The Court notes that the Defendants also rely on a doctor's note from Abigail C. O'Brien Scarchilli, M.D. of the Cardiovascular Medical Center in Long Beach, which similarly clears the Plaintiff to return to work without identifying any physical limitations. However, this note is dated January 15, 2013, nearly a full year before the Plaintiff apparently suffered his second injury.

In any event, the Plaintiff apparently returned to work sometime in early 2014. On April 3, 2014, a meeting was held with Principal Romano; Colaitis; the Plaintiff, and Hodge, who was then

the elective president of the Plaintiff's union, to discuss purported performance issues on the part of the Plaintiff.

An April 24, 2014 "Counseling Memorandum" documenting this meeting outlined numerous deficiencies in the Plaintiff's job performance, including failing to monitor and maintain comfortable temperatures in the high school building; falsely reporting a health hazard on school grounds; failing to ensure that the American flag was raised; and acting insubordinate during the meeting itself.

Relevant here, the April 24, 2014 memo also noted that:

During our meeting you indicated that you are working alone on the day shift and unable to complete all your work. I agree that the day shift generally warrants having two employees present. Therefore, I remind you that as Head Custodian, you can bring another employee to the day shift from the night shift temporarily to cover vacation periods.

As noted above, at his deposition, the Plaintiff confirmed that he regularly delegated to his subordinates any manual tasks that he felt unable to perform himself and that he had the authority as Head Custodian to reassign members of the custodial crew in order to compensate for staffing deficiencies.

During the same April 3, 2014 meeting, Colaitis allegedly stated in the presence of Romano and Hodge that he investigated the Plaintiff and learned that the Plaintiff had previously been fired by the Long Beach Police Department. The Plaintiff disputes the truth of this statement and contends that he voluntarily resigned from his position as a volunteer auxiliary police officer.

On May 1, 2014, the Plaintiff served the District with a Notice of Claim, alleging disability discrimination and retaliation. Although copies were received by Colaitis and the District Superintendent James Hunderfund, it is undisputed that the Defendant James Bosworth, the high school's Head of Maintenance, was not made aware of the Notice of Claim.

On May 5, 2014, while the Plaintiff was transporting garbage to an outdoor dumpster, he alleges that Bosworth and another employee named Daniel Triotta approached him in a school van. The two men were hauling pieces of a fire door to the dumpster for disposal. The Plaintiff alleges

that Bosworth blew a white powdery substance from the door into his face, which Bosworth told him was asbestos.

Although the substance was later tested and determined not to be asbestos, the Plaintiff alleges that the dust irritated his eyes and throat, and that the episode caused him emotional distress.

On June 4, 2014, an incident apparently occurred where the Plaintiff refused to speak to James Bosworth about a work-related matter without Principal Romano being present. This episode prompted Romano to prepare yet another "Counseling Memorandum" documenting the Plaintiff's behavior and criticizing his conduct as "dysfunctional and inappropriate." The memo explicitly directed the Plaintiff to communicate with his co-workers and administrators as needed during the workday and to refrain from further unacceptable behavior, lest he face disciplinary action, including termination.

On June 10, 2014, the District served the Plaintiff with formal disciplinary charges pursuant to New York Civil Service Law § 75 and suspended him for 30 days as a matter of course. This action is consistent with the Plaintiff's admission at his deposition that his performance had been criticized throughout his six years at the District.

After 30 days, while the charges were still pending, the Plaintiff was reassigned to Malverne Middle School, where he was to report to the District's Business Administrator Christopher Caputo. On his first day, the Plaintiff was provided certain materials and instructed by Caputo to prepare a budget for the middle school building. It is undisputed that the Plaintiff failed to comply with this directive and left of his own accord after several hours, claiming that his left arm hurt.

The Plaintiff never reported back to work.

Over the course of four days in August and September 2014, hearings were held with regard to the District's charges against the Plaintiff. At the hearings, the Plaintiff was represented by

counsel, who presented witnesses and arguments on his behalf, and cross-examined the District's witnesses.

In a subsequent written decision, the hearing officer sustained several of the charges sounding in incompetence, insubordination, and misconduct by the Plaintiff. Accordingly, the hearing officer recommended his termination.

On this recommendation, the District's Board of Education voted to terminate the Plaintiff in early 2015, and he has not sought alternate employment since that time.

Based on these facts, the Plaintiff commenced this action, alleging disability discrimination, hostile work environment, and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*; and the New York State Human Rights Law ("NYSHRL"), N.Y. EXEC. L. § 296 *et seq.* He also alleges that he was defamed by Colaitis, in violation of New York common law.

## II. DISCUSSION

### A. The Standard of Review

Under FED. R. CIV. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party.'" *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1998)).

"'[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 173-74 (2d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

## B.     Disability Discrimination

First, the Plaintiff brings claims against the District and the Board of Education for disability discrimination under the ADA; the Rehabilitation Act; and the NYSHRL, all of which are subject to a substantially similar analysis under the burden-shifting test originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)).

Namely, " '[a] plaintiff must establish a *prima facie* case; the employer must offer through the introduction of admissible evidence a legitimate, non-discriminatory reason for the [challenged employment action]; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext.' " *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2005)).

The Plaintiff alleges two theories of liability, namely, intentional discrimination and failure to accommodate.

### 1.     Intentional Discrimination

In relevant part, the ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to . . . employee compensation . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

To establish a *prima facie* case of intentional discrimination under the ADA, the Plaintiff must show that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.' " *Jarrell v. Hosp. for Special Care*, 626 F. App'x 308, 311 (2d Cir. 2015) (quoting *Sista*, 445 F.3d at 169).

In this case, the Defendants do not challenge the first three elements of this standard, namely, that the District is subject to the ADA; that the Plaintiff was disabled within the meaning of

the statute; and that he was otherwise qualified to perform the essential functions of his job. Rather, the Defendants dispute whether Plaintiff suffered an adverse employment action because of his disability.

In this regard, the Plaintiff relies solely upon his removal from the position of District Checker to establish an adverse employment action. In the Court's view, the evidence is sufficient to justify submitting that question to a jury.

Inasmuch as the decision to remove the Plaintiff from this position carried an attendant loss of a stipend, it plainly constitutes an adverse employment action. *See, e.g., Leibowitz v. Cornell Univ.*, 584 F.3d 487, 499 (2d Cir. 2009) (identifying "a material loss of benefits" among potential adverse employment actions). However, the analysis does not end there, as the Plaintiff must also establish a non-conclusory causal connection between his removal as the District Checker and his alleged disability.

The Court finds that the Plaintiff satisfied this burden through proof that his removal took place while he was still out on medical leave recovering from an apparently disabling shoulder injury, and that, in notifying the Plaintiff of this decision, Colaitis cited his "inability to perform" the responsibilities of the District Checker as the reason for his removal.

In the Court's view, this evidence is sufficient to raise an issue of fact as to whether the District's proffered non-discriminatory reason for his removal – namely, the routine reassignment of those responsibilities to the school's security staff – was pretextual.

Accordingly, to the extent that the Defendants seek dismissal of the Plaintiff's claim for intentional discrimination under the ADA, their motion for summary judgment is denied.

Further, the Court notes that claims for intentional discrimination brought under the Rehabilitation Act and the NYSHRL are analyzed using the same standard as analogous claims under the ADA. Therefore, the Defendants' motion for summary judgment dismissing the Plaintiff's claims for intentional discrimination under those statutes is denied for substantially similar reasons.

*See Rodriguez v. City of New York*, 197 F.3d 611, 617 (2d Cir. 1999) (Rehabilitation Act claims are analytically "identical" to ADA claims); *McDonnell v. Schindler Elevator Corp.*, 618 F. App'x 697, 698 (2d Cir. 2015) ("A similar standard" applies to discrimination claims brought under the NYSHRL and the ADA).

### 2.    Failure to Accommodate

Alternatively, the Plaintiff claims that the District failed to reasonably accommodate his disability. In this regard, "[a] defendant violates the ADA by 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship.' " *Graham v. Watertown City Sch. Dist.*, No. 10-cv-756, 2011 U.S. Dist. LEXIS 38398, at *25 (N.D.N.Y. Apr. 8, 2011).

"To establish a *prima facie* failure to accommodate claim, plaintiff must show: (1) [he] is disabled within the meaning of the ADA; (2) [his] employer had notice of [his] disability; (3) [he] could perform the essential functions of [his] job with reasonable accommodation; and (4) [his] employer refused to make such accommodations" *Id.* at *25-*26.

Here, again, the Defendants do not challenge the assertion that the Plaintiff was disabled within the meaning of the statute; that the District knew of the Plaintiff's shoulder injury; or that he could perform the essential functions of his job. Rather, they dispute whether the District had knowledge that the Plaintiff suffered continuing physical limitations that it nevertheless refused to reasonably accommodate.

In this regard, the Plaintiff contends that, due to the limiting effects of his shoulder injury, the custodial staff – comprised of three men on the night crew and two men on the day crew – was shorthanded. According to the Plaintiff, this was especially true since, at some time prior to the events in question, the District employed a full complement of six custodians. Thus, the Plaintiff

argues that, in recognition of his disability, the District should have reinstated the "sixth man" on the custodial crew by hiring an additional daytime custodian. In the Court's view, this argument lacks merit.

Initially, a claim based on a failure to accommodate may only exist where the employer failed to fulfill its affirmative duty to accommodate the *known* physical or mental limitations of a disabled employee. *See Tillman v. Verizon N.Y., Inc.*, 118 F. Supp. 3d 515, 538 (E.D.N.Y. 2015) (Spatt, J.). In this case, although the District knew that the Plaintiff suffered two on-the-job injuries, in both instances he produced doctor's notes clearing him for full duty without any workplace restrictions. The Court notes that, for purposes of this motion, the Plaintiff has submitted the report of an independent orthopedic examiner who apparently noted limitations in his right arm. However, the Plaintiff concedes that he never provided to his supervisors this or any similar doctor's note documenting a restriction on his ability to perform his duties as Head Custodian.

Further, "[i]t is an employee's burden to inform his employer not only of his alleged disability but also about his need for assistance and to suggest a reasonable accommodation." *Adams v. Rochester Gen. Hosp.*, 977 F. Supp. 226, 235 (W.D.N.Y. 1997) (citing *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 136-41 (2d Cir. 1995). In this case, the Court finds that the Plaintiff has not produced sufficient evidence showing that he affirmatively requested any accommodation from the District.

The Plaintiff relies heavily on the testimony he gave during the 50-h hearing in this case, which the Court finds, at best, to be conflicting. On one hand, the Plaintiff testified that he did, in fact, ask Colaitis to reinstate the third man to the daytime cleaning crew. However, on the other hand, his testimony falls short of indicating that he did so as an accommodation for his disability. Rather, he testified that there had been a vacancy in the custodial staff for nearly three years that was left unfilled for budgetary reasons. In this regard, contrary to Plaintiff's contention that he specifically proposed filling this vacancy to accommodate his injury, he testified that he had

requested the same relief three years earlier, when the position first became available, and was similarly refused prior to suffering any injury. In fact, when asked during the same 50-h hearing whether, upon returning to work he notified Colaitis that there were certain tasks he could not perform, the Plaintiff plainly answered "No. I came in to do my job and did it as best I could."

Finally, the record is clear that the Plaintiff had the authority to make such staffing adjustments as were reasonably necessary to accommodate his workload. In this regard, the Plaintiff's formal job description plainly contemplates the ability to assign tasks to subordinates and supervise their performance. In this regard, the Plaintiff testified that, following his injury, he regularly delegated to his subordinates any manual tasks that he felt unable to perform himself and experienced no limitation in his ability to do so.

Moreover, to whatever extent the Plaintiff felt that his recovering shoulder left the custodial crew shorthanded, he was indisputably authorized to reassign members of the evening cleaning crew to help on the day shift. This authority was confirmed by Colaitis in writing, apparently in response to a complaint by the Plaintiff that was substantially similar complaint to the one at issue here. Namely, Colaitis specifically wrote that, with regard to the Plaintiff's concerns about the custodial crew being understaffed, "as Head Custodian, [the Plaintiff] can bring another employee to the day shift from the night shift temporarily to cover vacation periods."

Apparently the Plaintiff chose not to do so, and therefore may not now be heard to complain that the District failed to provide him with the extra staffing necessary to accommodate his injury. His conclusory assertions that such staffing changes were impractical or unreasonable are not adequately supported by the record.

For these reasons, to the extent that the Defendants seek dismissal of the Plaintiff's claim for failure to accommodate under the ADA, their motion for summary judgment is granted.

Also, again, since claims for failure to accommodate brought under the Rehabilitation Act and the NYSHRL are analyzed using the same standard as analogous claims under the ADA, the

Defendants' motion for summary judgment dismissing the Plaintiff's claims for failure to accommodate under those statutes are denied for substantially similar reasons. *See Lyons v. Legal Aid Soc'y*, 68 F.3d 1512, 1515 (2d Cir. 1995) (applying similar standard to claims based on failure to accommodate under the Rehabilitation Act and the ADA); *Casseus v. Verizon N.Y., Inc.*, 722 F. Supp. 2d 236, 351 (E.D.N.Y. 2010) (noting that, except only for differing language in the definition of a "disability," which is not relevant here, "the analysis for the[ ] other elements [of a claim for failure to accommodate under the NYSHRL] is identical to the analysis under the ADA").

C.     **Hostile Work Environment**

The Plaintiff also brings claims against the District and the Board of Education for hostile work environment under the ADA; the Rehabilitation Act; and the NYSHRL. However, the Court finds that the record as a whole fails to support a reasonable inference that, because of his shoulder injuries, the Plaintiff was subjected to a workplace that was so permeated with discriminatory intimidation, ridicule, and insult, that the terms and conditions of his employment were altered for the worse. *See Lumhoo v. Home Depot United States*, 229 F. Supp. 2d 121, 152 (E.D.N.Y. 2002) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S. Ct. 2399, 31 L. Ed. 2d 49 (1986)).

In the Court's view, none of the events identified by the Plaintiff as contributing to a hostile work environment rises to an actionable level. First, the Plaintiff claims that, during a meeting at an unspecified time in 2011, Colaitis used the back of his hand to slap the Plaintiff's stomach. The Plaintiff claims that the contact did not hurt him, but rather that it surprised him. However, contrary to his current position, the Plaintiff did not testify that this incident had anything to do with his disability. Rather, he felt that Colaitis was mocking his weight.

On other occasions, the Plaintiff claims that Colaitis yelled at him in a threatening manner. For example, on an unspecified date after his first injury, the Plaintiff recalls Colaitis cursing at him over a two-way radio within earshot of the Plaintiff's wife and children. On another occasion, the

Plaintiff claims that Colaitis reprimanded him over the phone and warned that if the Plaintiff did not resolve a heating issue at the school, he would "blow somebody's head off." Again, even if the Court found these incidents to be sufficiently abusive, there is no evidence connecting them to the Plaintiff's alleged disability. *See Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) ("It is . . . important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals"); *D'Antonio v. Petro, Inc.*, No. 14-cv-2697, 2017 U.S. Dist. LEXIS 46762, at *19-*20 (E.D.N.Y. Mar. 29, 2017) (granting summary judgment on a hostile work environment claim where "there [was] nothing in the[ complained of] incidents that even suggested they [were] tied to plaintiff's protected status, viz. disability") (citations omitted).

The Plaintiff also relies upon various acts of alleged aggression by Bosworth to establish a hostile work environment, including the incident described above where the Plaintiff believed Bosworth exposed him to asbestos. However, the Plaintiff's current claims are belied by his deposition testimony that, although hostile, he does not believe that any of Bosworth's alleged misconduct was motivated by his disability.

Accordingly, to the extent that the Defendants seek dismissal of the Plaintiff's claim for a hostile work environment under the ADA, the Rehabilitation Act, and the NYSHRL, their motion for summary judgment is granted.

**D.    Retaliation**

The Plaintiff also brings claims against the District and the Board of Education for retaliation under the ADA; the Rehabilitation Act; and the NYSHRL. Namely, the Plaintiff contends that the District's decision to bring disciplinary charges against him was retaliation for the Notice of Claim he served approximately six weeks earlier on May 1, 2014.

In the Court's view, even assuming that the temporal proximity between these two events is sufficient to make out the Plaintiff's *prima facie* case, that circumstance alone cannot suffice to raise

an issue of fact as to the District's legitimate, non-retaliatory reasons for the charges. *See Sanderson v. N.Y. State Elec. & Gas Corp.*, 650 F. App'x 88, 94 (2d Cir. 2014) ("While temporal proximity alone may be sufficient to satisfy a retaliation plaintiff's *prima facie* burden, we have held that 'temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext'") (quoting *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010)).

Aside from the closeness in time between the Plaintiff's service of a Notice of Claim and the District's imposition of formal disciplinary charges, the Plaintiff has produced no evidence supporting a reasonable inference that the District's reliance on his performance history as the reason for the charges was actually a pretext for retaliation. On the contrary, the Plaintiff concedes that his relationship with Colaitis soured as early as 2008, and that his job performance was repeatedly criticized throughout his six years of employment. There is no evidence to suggest that any aspect of the Plaintiff's working conditions materially worsened after his injury.

Any inference of retaliation is also refuted by the fact that, following a hearing at which he was represented by counsel, an independent hearing officer sustained the District's charges sounding in incompetence, insubordination, and misconduct by the Plaintiff. Moreover, it is undisputed that the Board only voted to act on the hearing officer's recommendation of termination after the Plaintiff was reassigned to the middle school; failed on his first day to follow his new supervisor's directives; and left without permission, never to return.

Under these circumstances, the Court discerns no genuine question of material fact as to whether the District retaliated against the Plaintiff for serving a Notice of Claim. Therefore, to the extent that the Defendants seek dismissal of the Plaintiff's claim for retaliation under the ADA, the Rehabilitation Act, and the NYSHRL, their motion for summary judgment is granted.

Further, the Court notes that, in their legal memoranda, the parties set forth substantive arguments regarding Bosworth's individual liability for retaliation. However, the amended

complaint only alleges claims for retaliation against the District and the Board. Therefore, since the operative pleading does not charge Bosworth, individually, with retaliation, the Court need not address those arguments.

E.    **Individual Aider and Abettor Liability**

The Plaintiff also brings claims against the individual Defendants Colaitis, Bosworth, and Hunderfund for aiding and abetting discriminatory and retaliatory conduct by the District and the Board.

As an initial matter, given the Court's prior determination that the Plaintiff's claims based on failure to accommodate; hostile work environment; and retaliation cannot survive summary judgment, the Court construes this claim as relating only to the individual Defendants' potential liability for aiding and abetting the removal of the Plaintiff from his position as the District Checker.

In this regard, section 296 of the NYSHRL makes it unlawful for any person to "aid, abet, incite, compel or coerce the doing of" any act forbidden under that statute, including discriminating against someone on the basis of a disability. *See* N.Y. EXEC. L. § 296(1)(a), (6). To establish aider and abettor liability, the Plaintiff is required to produce evidence sufficient to support a reasonable inference that the individual Defendants actually participated in the conduct giving rise to the claim of discrimination. *See Tomka v. Siler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995).

As it relates to the Defendant Bosworth, the record lacks any evidence that he was at all involved in the subject adverse employment action, and, in opposing this motion, the Plaintiff sets forth no argument to the contrary. Accordingly, to the extent that the Defendants seek dismissal of the Plaintiff's claim against Bosworth for aider and abettor liability under the NYSHRL, their motion for summary judgment is granted.

As it relates to the Defendant Hunderfund, the Plaintiff proceeds on a theory that he, as the District Superintendent, failed to take adequate measures to remedy workplace discrimination. However, to make this point, the Plaintiff relies exclusively on facts post-dating the only adverse

employment action left in issue, namely, the Plaintiff's removal from the District Checker position.

In this regard, the Plaintiff relies on Hunderfund's alleged knowledge of, and failure to take remedial action with regard to: (1) the Plaintiff's repeated statement during the April 3, 2014 meeting that, "This hostility towards me stops today"; (2) his reports to District officials that Bosworth exposed him to a substance he believed to be asbestos; and (3) his service of a Notice of Claim alleging disability discrimination and retaliation.

However, as noted above, the Plaintiff was removed from the District Checker position in mid-2011, approximately three years prior to the earliest of these occurrences. Therefore, even construing these facts in the Plaintiff's favor, they cannot logically demonstrate Hunderfund's participation in the challenged employment action.

Accordingly, to the extent that the Defendants seek dismissal of the Plaintiff's claim against Hunderfund for aider and abettor liability under the NYSHRL, their motion for summary judgment is also granted.

However, the Court reaches a different conclusion with respect to Colaitis. As noted above, arguably the best evidence of a discriminatory motive behind the decision to remove the Plaintiff from the position of District Checker is the letter by Colaitis, prepared while the Plaintiff was on medical leave, citing as the reason for his removal his "inability to perform" the duties of that position.

In the Court's view, this is sufficient evidence of direct participation in potential disability discrimination so as to raise a question of fact for a jury. Accordingly, to the extent that the Defendants seek dismissal of the Plaintiff's claim against Colaitis for aider and abettor liability under the NYSHRL, their motion for summary judgment is denied.

F.    Defamation

Finally, the Plaintiff brings a claim against Colaitis for defamation arising from the alleged false statement, made by Colaitis during the April 3, 2014 meeting in the presence of Romano and Hodge, that the Plaintiff had previously been fired by the Long Beach Police Department.

To establish a claim for defamation under New York law, the Plaintiff must show: "(1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation *per se* or caused 'special damages.' " *Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 329 (S.D.N.Y. 2010).

In this case, two elements of the relevant legal standard are in dispute.  First, the Defendants contend that the challenged statement was privileged, thereby defeating the second element of a claim for defamation.

In this regard, the Court notes that "New York law affords qualified protection to defamatory 'communications made by one person to another upon a subject in which both have an interest.' " *Albert v. Loksen*, 239 F.3d 256, 272 (2d Cir. 2001) (quoting *Stillman v. Ford*, 22 N.Y.2d 48, 53, 238 N.E.2d 304, 290 N.Y.S.2d 893, 897 (1968)).  Thus, "[c]ommunications by supervisors or co-workers made in connection with the evaluation of an employee's performance, including allegations of employee misconduct and communications regarding the reasons for an employee's discharge, fall within the privilege." *Id.* (citations omitted).

"To overcome this qualified privilege, a plaintiff must allege not only that the statement in question was false, but that it was made 'with actual malice, such as personal spite, ill will, or culpable recklessless or negligence.' " *Aquilone v. Republic Nat'l Bank*, No. 98-cv-5451, 1998 U.S. Dist. LEXIS 19531, at *8 (S.D.N.Y. Dec. 15, 1998) (quoting *Grier v. Johnson*, 232 A.D.2d 846, 847, 648 N.Y.S.2d 764 (3d Dep't 1996)).

In this case, the parties dispute whether Colaitis forfeited his qualified privilege by acting with malice when he accused the Plaintiff of having been fired from a previous job. In the Court's view, this question is sufficiently close to warrant its submission to a jury.

In particular, although it is reasonable to conclude that the Plaintiff's job performance and employment history would have been relevant to all of those present at the April 3, 2014 meeting, and therefore potentially privileged, the parties nevertheless appear to agree that the meeting was tense, and crediting the Plaintiff's version of the events, a jury could justifiably find that Colaitis' remark was made maliciously.

In this regard, the April 3, 2014 meeting cannot be considered in a vacuum – the record is clear that Colaitis and the Plaintiff had a years-long relationship that was apparently punctuated by periods of personal contentiousness. Further, the Counseling Memorandum that Colaitis authored memorializing the meeting in question provides a glimpse into the circumstances under which his remark about the Plaintiff's separation from the Long Beach Police Department was made:

> From the outset of the conference, at which your union representative was present, you displayed an uncooperative and insubordinate attitude. First, you refused to sit at the conference table and instead insisted on sitting in a chair against the wall. Second, you refused to answer most of my questions. Instead, you kept repeating aloud "This hostility towards me stops today." Your actions rendered the meeting unproductive. You got up and walked out of the meeting prior to the end of the meeting without being excused. Mr. Hodge took it upon himself to chase after you and bring you back to the meeting.

In the Court's view, notwithstanding any alleged common interest that the meeting participants may have had in the Plaintiff's tenure with the Long Beach Police Department – a matter of questionable relevance given the intended purposes of the meeting and the Plaintiff's already lengthy tenure with the District – there is sufficient evidence to permit a rational jury to conclude that, as tempers flared, Colaitis made the challenged remark with actual malice.

However, the Plaintiff's defamation claim fails, as a matter of law, on an alternative basis, thereby warranting summary judgment. Namely, the parties also dispute whether the challenged statement was defamatory *per se*, thus satisfying the fourth element of a *prima facie* claim.

Relevant here, "[s]tatements that 'tend to injure another in his or her trade, business, or profession' constitute defamation *per se*." *MapInfo Corp. v. Spatial Re-Engineering Consultants*, No. 02-cv-1008, 2006 U.S. Dist. LEXIS 70408, at *42 (N.D.N.Y. Sept. 28, 2006) (quoting *Liberman v. Gelstein*, 80 N.Y.2d 429, 435, 605 N.E.2d 344, 590 N.Y.S.2d 857 (1992)).

In this regard, the Defendants argue that, at best, the statement in issue reflected generally upon the Plaintiff's character and qualities, which cannot constitute defamation *per se*. Rather, since Colaitis' statement did not touch upon any specific traits regarding the Plaintiff's fitness to perform the essential functions of a Head Custodian, the Defendants contend it cannot be defamatory *per se*. The Court agrees.

It is well-settled that, in order to be defamatory *per se*, the challenged statement must be "of a kind incompatible with the proper conduct of the [Plaintiff's] business, trade, profession or office itself" and "must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities." *Ferlito v. County of Suffolk*, No. 06-cv-5708, 2007 U.S. Dist. LEXIS 85523, at *14 (E.D.N.Y. Nov. 19, 2007) (finding that a statement accusing the plaintiff of having a history of disorderly conduct and resisting arrest was not defamatory *per se* because it was unrelated to his status as an attorney); *see also Jordan v. Tucker*, No. 13-cv-6863, 2017 U.S. Dist. LEXIS 76702, at *29 (E.D.N.Y. May 19, 2017) (finding that a statement suggesting the plaintiff's home was going to be foreclosed on was not defamatory *per se* because claims regarding his personal finances were entirely unrelated to his profession in the insurance industry; noting that the plaintiff failed to articulate a connection between the challenged statement and his fitness for the performance of the duties of his profession).

Applying this standard, the Court finds that Colaitis' generalized accusation that the Plaintiff was terminated from a prior position – without identifying any purported basis for the termination – did not at all bear upon his fitness to be the Head Custodian at Malverne High School.

In the Court's view, the Plaintiff's assertion that Colaitis' statement "impugned [his] reputation for integrity and professionalism in his employment with the District," is precisely the type of attenuated and non-specific connection that the rules regarding defamation *per se* seek to prevent.

Accordingly, the Court finds that the Plaintiff has not satisfied an essential element of his claim for defamation under New York law, namely, that the alleged defamatory statement either constituted defamation *per se* or caused special damages. Therefore, to the extent that the Defendants seek dismissal of the Plaintiff's defamation claim against Colaitis, their motion for summary judgment is granted.

## III.   CONCLUSION

Based on the foregoing, the Defendants' motion for summary judgment is granted in part and denied in part.

In particular, the Court GRANTS the following portions of the motion:

(1) The First Cause of Action against the District and the Board is dismissed insofar as it alleges a failure to accommodate and/or a hostile work environment under the ADA; the Rehabilitation Act; and the NYSHRL;

(2) The Third Cause of Action against the District and the Board, alleging retaliation under the ADA; the Rehabilitation Act; and the NYSHRL, is dismissed in its entirety;

(3) The Fourth Cause of Action, alleging aider and abettor liability under the NYSHRL, is dismissed as against the individual Defendants Hunderfund and Bosworth only; and

(4) The Fifth Cause of Action against the individual Defendant Colaitis, alleging New York defamation, is dismissed in its entirety.

Insofar as the Fourth Cause of Action contained the only remaining claims against the individual Defendants Hunderfund and Bosworth, this action is dismissed as against them in its entirety.

Further, the Court DENIES the following portions of the motion:

(1) The First Cause of Action against the District and the Board survives insofar as it alleges intentional discrimination under the ADA; the Rehabilitation Act; and the NYSHRL; and

(2) The Fourth Cause of Action, alleging aider and abettor liability under the NYSHRL, survives as against the individual Defendant Colaitis only.

Therefore, the sole issue remaining for trial is whether, in May 2011, the District and the Board, aided and abetted by Colaitis, intentionally discriminated against the Plaintiff on the basis of a disability by removing him from the position of District Checker.

Consistent with this opinion, the Clerk of the Court is respectfully directed to amend the official caption as follows:

```
---------------------------------------------------------------------------x
NICHOLAS AIOLA,

                Plaintiff,

       -against-

MALVERNE UNION FREE SCHOOL DISTRICT, MALVERNE
UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION,
and SPIRO COLAITIS,

                Defendants.
---------------------------------------------------------------------------x
```

This case is respectfully referred back to United States Magistrate Judge Anne Y. Shields for the completion of discovery.

It is **SO ORDERED.**

Dated:  Central Islip, New York
        September 5, 2017

                                              */s/ Arthur D. Spatt*
                                              ARTHUR D. SPATT
                                              United States District Judge